Madam Clerk, will you please call the first case? 14-2827, Jefferson Drive, Phoenix. Okay, I'd like for the attorneys to step up to the podium. I'd like for you to tell me who you represent and approximately how much time your argument will take. We'll start with the appellant. Please step up. You can step up at the same time, Counselor. Good morning, Counselor. Good morning. My name is Deepa Punjabi. I represent the defendant appellant, Mr. Eubanks. And if this court will allow my argument, I'm anticipating 15 to 20 minutes. I think we can allow that. How much time do you need for rebuttal? Probably an additional five minutes. That's very good. Thank you. Thank you, Counselor. Good morning, Your Honor. Good morning, Your Honor. Assistant State's Attorney, Sarah Simpson, on behalf of the people of the State of Illinois. And I anticipate as well my argument will be approximately 20 minutes. 20 minutes. Very good. All right, Counselor, why don't you proceed with your argument? Could you speak up, please? These are not amplified. Oh. So if you're not speaking up, we can't hear you. Sure, I'll speak up. You should be advised that we've read the briefs and I would just get into my principal arguments. Okay, so if it pleases the Court, my intent today was to focus primarily on issues number one and three related to the denial of the reckless homicide instruction and the constitutionality of the chemical testing statute. Although I will entertain, of course, any questions on any of the arguments that were briefed. Very good. Proceed. So at this court opening, I first wanted to spend a few minutes talking about the jury instruction issue. The State in its brief mentioned that our Supreme Court in McDonald last year clarified that the standard of review for this issue is an abuse of discretion. But McDonald also adopted a less stringent test for trial courts to apply to trigger the issuance on a lesser included offense. McDonald had noted that in the past, sometimes they had ruled you need some credible evidence to issue a lesser included offense instruction. Sometimes they had ruled you need some evidence. And in McDonald, they adopted the some evidence standard and rejected the some credible evidence standard because it's not the province of the trial court to weigh the evidence when deciding whether a jury instruction is justified. That's what the trial court did here. It intruded upon the province of the jury and the findings it made when it denied the reckless homicide instruction. So what evidence do we have in this case of reckless conduct when the defendant testified that he wasn't driving the car? Well, the defendant testified that he wasn't driving the car. In his opening statement, I believe he stated to the jury, but if I'm guilty of anything, it's reckless homicide. So he clearly wanted to offer this alternative theory and he's entitled to- What evidence do we have in the record? An opening statement is an evidence, correct? Sure. I think the main evidence we've got here is defendant's high speed, both his high speed and his intoxicated state. Both factors that multiple cases in Illinois have held are probative on the issue of recklessness. So this indicates some evidence of recklessness. You also have Ms. Madeline Morado's testimony. She testified that the collision occurred on a quiet street in a quiet neighborhood. But the court made a finding, I believe, that people would have been out and about. This was a busy populated area. But Morado's testimony was some evidence that the defendant's conduct and manner of driving was merely reckless rather than knowing. There's a difference, for example, if you're driving in the middle of the day at 3 p.m. when school lets out in a school zone in that manner, as opposed to late at night in a quiet residential area. The level of risk is different and I think that that's a close enough call that you can say that that constituted some evidence, at least enough to create a question for the jury that the question should have been put before the jury on the issue of mental state. Well, the state says that Allsup and Thomas support convictions for first degree murder under very similar circumstances. Yes. The state pointed to Allsup and Thomas. But there I believe the trial court determined that there was at least enough evidence of recklessness to issue a recklessness instruction. There was at least the factors of high speed and intoxication at least created a question for the jury that the jury should have resolved on the issue of mental state. So if you keep out the results of the blood and urine draws, are you still relying on intoxication? If you keep out the blood and urine draws, you know, there's some evidence. I think he stated that he and his video statement that he ingested a quart of Hennessy. So that constitutes some evidence. I know there was some back and forth about at what point in the day he had ingested it. But even if you keep that out, there's still some evidence of recklessness that I think enough to create a question to put before the jury. And the state, you know, they make the argument that the evidence of first degree murder here was so strong that failure to instruct on the lesser wouldn't have made a difference. But the Supreme Court has said on questions of intent, that's a task particularly suited to the jury. You know, I think one of the cases the state cites on its harmlessness argument is Washington where the defendant was convicted of armed robbery and the court found that failure to instruct on theft was harmless because the jurors found that there was ample evidence of use of a dangerous weapon. So they couldn't reasonably have found him guilty of just theft. But there the enhancing element didn't concern intent. And our Supreme Court has said on questions of intent, this really is particularly suited to the jury, particularly here where it's such a nuanced factual determination to be made. Whether the defendant knew death was strongly probable or merely likely, it's such a fine line that I think it's really best left for the jury. Where you do have classic recklessness factors like speed and intoxication, witnesses describing the scene as quiet and residential, I think it was a determination that should have been left to the jury. If this court has no more questions on the reckless homicide instruction issue, I'd like to move on to discuss the constitutionality of the blood and urine draws in this case. The statute at issue here provides that notwithstanding any refusals or revocations of consent, when the police have probable cause to believe that someone's been driving under the influence and there's been a death or personal injury, the law officer shall request and the person shall submit to the law officer's demand to test the person's blood, breath, or urine. So this statute instructs officers to compel chemical testing of a DUI suspect's body without regard for the feasibility under the totality of the circumstances of securing a warrant prior to testing. And this does not pass constitutional muster under Missouri v. McNeely. In McNeely, the Supreme Court held that the possibility of dissipation of substances in a suspect's body does not support a per se exigency authorizing warrantless blood tests. And in doing so, the court repeatedly used language that rejected altogether a categorical per se approach to defining exigencies in this context, whether a warrantless blood test of a drunk driving suspect is reasonable must be determined case by case based on the totality of the circumstances. But this statute takes a categorical per se approach to defining exigencies and instructs the police officers to compel testing of a DUI suspect's body without undertaking this inquiry of whether a warrant can feasibly be obtained under the totality of the circumstances. And as such, there's an inherent constitutional defect in the statute. The Supreme Court's more recent decision in Birchfield v. North Dakota supports our reading of McNeely. And I received notice today that you allowed my motion to cite Birchfield. So I thank you for that. That's correct. And the state is responding. Yes. So in Birchfield, the defendants, all of whom were drunk driving arrestees, challenged the criminalization of their refusal to submit to warrantless breath and blood tests. And the Supreme Court drew a distinction between testing a driver's breath and a driver's blood, noting that blood tests are a much more severe physical intrusion into the body. And the court thus concluded that while breathalyzer tests can be administered in a categorical way as a search incident to a lawful arrest, due to the intrusive nature of blood tests, they were going to set a higher bar there. Warrantless blood tests needed to be supported by a search warrant or by the provable exigencies under the specific facts of the case, reiterating their McNeely holding. And Justice Alito had some powerful language about how a blood test implicates a person's most basic and deeply held expectation of privacy in their own body and their interest in basic human dignity and not having that bodily integrity violated. And so the court reiterated the McNeely holding that to justify as deep an intrusion as a warrantless blood draw, the state really needs to be able to show that the officers did not have, under the specific circumstances presented to them, sufficient opportunity to obtain a warrant in a timely manner. And the court talked about how other warrant exceptions can apply categorically. But the question of whether there are exigent circumstances to justify a warrantless blood draw is a question that must be decided in a case-specific fashion. And the statute... But McNeely was decided years after the events in this case. That's correct. And the state argues that the officers could have relied on our Supreme Court's decision in Jones. That's correct. The state urges that the good faith exception to the exclusionary rule should apply and that police could have been relying on people v. Jones, which held that the dissipation of substances in the suspect's bloodstream constituted a per se exigency justifying warrantless compelled chemical tests of the suspect's body. But Jones had an explicit caveat. Jones held that our holding in this case does not give law enforcement officers unbridled authority to order and conduct chemical tests. We do not suggest that a DUI arrestee's lack of a right to refuse chemical testing under Section 11-501.2C2 permits law enforcement officers to use physical force in obtaining blood, urine, and breath samples. So Jones does not authorize the police's conduct here to act as they did because it's pretty clear that they had to use physical force to obtain these blood and urine samples. For the blood draw, Mr. Hubanks had to be handcuffed to the bed. He was shouting. He was yelling. He had continually refused, and he had to be physically handcuffed to the bed to carry out this blood draw. With respect to the urine draw, he continually had refused to provide urine, and it was only after the nurse was approaching with the catheter, threatening to insert it, that he relented and provided urine. So Jones does not authorize the kind of conduct that the police engaged in here. So I don't think the good faith exception applies in this case. With respect to our as-applied challenge, the State is not able to show exigent circumstances here. It's the State's burden to show the exigencies, and they stipulated to a very Christian factual basis for the hearing on the motion to suppress, and they were unnoticed that defense counsel was alleging there were not sufficient exigencies here. And they were unnoticed that defense counsel was challenging the constitutionality of this statute, and they chose to proceed by way of this factual stipulation. They didn't present evidence on the facts that would generally be pertinent to the question of whether exigencies excused the lack of a warrant, facts such as, you know, how many officers were involved in the investigation? Did anybody try to get a warrant? What were they occupied with? Was a judge available? Could any of the officers have put off the things they were doing, like interviewing witnesses or whatnot, to tend to the task of obtaining a warrant? And if not, why not? So to the, you know, it was the State's burden to show exigent circumstances. To the extent that there are any omissions in the factual record, I think that should weigh against the State, because they had the opportunity at the hearing to say, look, we were short-staffed or, you know,  I don't think this court on review can just assume that it was too hard for them to obtain a warrant. It was the State's burden to show that, to make that showing. And to the extent that the facts show anything, I think they tend to support a lack of exigent circumstances. You know, this was not a case where the police had to spend a long time pursuing a suspect or investigating exactly what occurred. The collision that caused the fatality occurred at 8.58 p.m. Mr. Eubanks was arrested by 9.05 p.m. Witnesses on the scene immediately apprised the police of what had occurred. Around midnight, Mr. Eubanks refused testing. So at least as of that point, they knew that he was not going to submit voluntarily to testing and that they may need a search warrant. Another three hours passed before he was actually transported to the hospital. So I think this timeline really enforces that this was not a case where the police were afraid that the delay necessary to obtain the warrant would have threatened the destruction of evidence or threatened the dissipation of evidence in Mr. Eubanks' blood and urine because they waited so many hours to have him tested. You know, seven or eight hours from the time of Mr. Eubanks' arrest and at least four or five hours from the time of his refusal for the police to try to obtain a warrant and the state just doesn't provide an adequate explanation for why a warrant couldn't have been obtained at that time. So because there wouldn't have been any evidence of intoxication without these test results or at least there wouldn't have been any evidence certainly of the drug usage, this court should reverse outright the conviction of aggravated driving under the influence. On the first degree murder charge, the intoxication evidence would go to the question of Mr. Eubanks' mental state. So we're asking that the court remand for a new trial on that issue. He's saying if you take the blood and the urine out and he's saying unimpaired, why are we talking about mental state in a different way now? I'm sorry? If you take the blood and the urine out, he's unimpaired. He's responsible for his actions. He knew he was driving fast. He knew he was driving down the street. So certainly the fact of intoxication can… We're not talking about intoxication. Right, that's fine. Sure. So let's say for a minute we buy your argument. Here we go. Now he's unimpaired and responsible. He decides to go 80 miles an hour down a single residential street. How is that not knowing? You're asking how would that affect the argument one? Yeah, intent. Yeah, but I think we still have Madeline Morado's testimony that this was a quiet street, and I think that's powerful evidence of recklessness. It is a completely different thing to be… Certainly. I appreciate what you're saying, but there's a different, you know, there was some evidence he admitted to drinking a quart of Hennessy. Now there was some question about when exactly that occurred. He was not admitting he drove the car. But as an alternative theory… You've got yourself in this loop that I don't see how you get out of. He's not admitting he drove the car. People said he was driving the car. You're saying you want the blood and urine out so he's not intoxicated, he's not impaired, he's rational, he's making a choice, he chooses to drive 80 miles an hour, 60, 80 miles an hour down a quiet residential street at what, 8 o'clock at night? When it's likely, it's not 2 in the morning, it's 8 o'clock at night, there are likely to be people, any people around him. How does that affect your interpretation of intent here? It affects my, well, so his video statement still, there's an admission to drinking alcohol. That would not be suppressed by the test results. That the jury still would have seen. So you have that evidence. You have the high speed, which also has been held to be indicative or probative on the issue of recklessness. And you have Ms. Murato's testimony that this is a quiet street, a quiet neighborhood. That's a different thing from driving in the middle of the day in a business district or something. 8 o'clock at night. 9 o'clock at night, yes. Not 2 o'clock in the morning. Yes. I appreciate what you're saying, Your Honor. I see you in this loop that is difficult. Yeah. Thank you. Do you have anything further? Anything further, Counsel? No, Your Honor. Do you stand on your brief with respect to the other issues? I do stand on my brief with respect to the other issues. Thank you very much. Thank you. Good morning, Ms. Simpson. Good morning. May it please the Court. With respect to the defendant's first issue regarding the jury instruction, the trial court here properly denied the defendant's reckless homicide instruction at the close of the evidence. And as Fence Counsel noted, the standard to be applied is whether there was some evidence to support the lesser included reckless homicide instruction. However, that was not all. The trial court also had to determine whether there could be a rational finding by the jury. So the trial court is only required to give the lesser included offense instruction where the evidence would rationally permit the jury to acquit the defendant of the greater offense of first-degree murder and find him guilty of only the lesser included reckless homicide. And on these facts in this case, that finding was not possible. A rational jury could not acquit the defendant of knowing first-degree murder and find him guilty of only reckless homicide on these facts. And as you know, as Fence Counsel noted, it is an abuse of discretion standard, and the court was well within its discretion in making this finding. To find the defendant guilty of first-degree murder, it had to be established that he knew or was consciously aware that his acts created a strong probability of death or great bodily harm. And significantly in this case, as the court has noted, is the defendant has presented no evidence of his recklessness in his case. His theory of the case was that he wasn't driving the car, and he actually wasn't even at the scene. Well, but the state had ample evidence from Tanner and other, that the defendant was driving the car. Absolutely. But the significance of that is that the court, there's nothing that the court can look at in the defendant's case to find the sum of evidence that will allow a rational jury to find him guilty of reckless homicide only. So tell me why, then, in Alsup and Thomas, those juries under very similar circumstances were given both instructions. Well, those issues went before the court. But tell me. Well, I mean. It's an abuse of discretion standard, which is very deferential to the trial court. Right. And so you've got very similar cases where there is now under McDonald some evidence, whatever it is, that defendant's conduct is reckless as opposed to intentional, and the jury gets that instruction. In those cases or in our case? Well, how about here? In our case, it can't just be that there's some evidence that it was reckless. It has to be some evidence that will allow the jury to quit on the first-degree murder charge. And when you look at all of these factors, and I feel like what the defense is attempting to do is to parcel out individual factors, like if it was just intoxication or if it was just a residential neighborhood. And if the circumstances were different and that was the only evidence, would it be a different situation? Possibly. But in this case, when you look at all of the factors, you have a defendant who was intentionally fleeing from the police, a total of nine blocks in a densely populated Rogers Park neighborhood. The defense attempts to call this neighborhood quiet because of Madeline Murado's testimony. She said quiet in a residential setting. If you look at that video that the people submitted that reenacts the path the defendant took, this street is populated by large, high-rise, multi-unit buildings. This is a densely populated residential neighborhood in an urban area of the city of Chicago. And her point is that the time of day makes a difference? We would submit that at 9 o'clock at night, there is just as many people in the city of Chicago as there are at 2 in the afternoon or 3 p.m. This was 9 o'clock at night in the early evening. And the way the defendant was driving, besides the fact that he was intentionally fleeing from the police, the witnesses put him anywhere between 60 and 90 miles an hour during this drive. You had his front-seat passenger saying that he was driving 60 to 70 miles per hour. To Maurice Glover at the scene, who estimated his speed at being 80 to 90 miles an hour. And during that time, he intentionally sped through eight different stop signs. These are traffic control devices put up to protect the public. And the defendant went through every single one, including one at a three-way stop sign at Howard, and one at an underpass, and one at Tuey, both of which are major intersections. So the fact that the collision occurred in a residential street, it could have quite possibly occurred at Tuey or Howard or any one of the major thoroughfares the defendant chose to speed through during his flight. He's not being chased by the police, either, was he? No, but he believed he was, and that's what was significant. As he left that traffic stop, Chicago Police, based on the nature of the traffic stop, did not pursue him, but he thought they did. And that's why he was driving in the manner that absolutely he had to be consciously aware that death or great bodily harm would occur to someone on the street, or even as significantly, if you look at the actions of Calvin Tanner, his own front seat passenger, Calvin testified that as the defendant was driving, he pled with him to stop, to slow down. He testified that he was scared for his own life that he was going to go through the windshield or that he was going to get hurt. And he testified he closed his eyes, tried to brace himself against the dashboard, and put on his seat belt. So the defendant was on notice with that fact alone that his conduct was threatening great bodily harm to his own front seat passenger. But, Kelsey, the test is whether or not there is some evidence of recklessness. Some evidence. Some evidence. You would argue that there's no evidence of reckless conduct, speeding at 9 o'clock at night, going through these stop signs. That's not evidence of recklessness? The distinction in this case. Just answer my question. Is that evidence of recklessness? There's evidence of reckless conduct to the extent that's lesser included at first-degree murder. So in many cases, there is evidence of the lesser included, like if a battery is lesser included of a murder. But we don't always instruct on the lesser included because the jury has to be able to acquit of the greater offense and find them guilty of only the lesser offense. And under these circumstances, that just wasn't a rational finding for the jury to make. And going back to Thomas and Stevens and also in those cases, the courts there found that each of those cases under very similar factors, that you have speeding, you have a passenger that's pleading for their life to slow down, you have a high-speed chase going through red lights at 70 miles an hour. Each one of those cases, the court found the evidence supported a first-degree murder instruction, which is why there are several objections here. In those cases, though, those juries had the choice. The court found evidently that both reckless homicide and first-degree murder were appropriate instructions. And the jury found the defendants guilty in those cases of first-degree murder, giving the jury the choice. And Justice O'Neill's question is, when you have those very similar circumstances here, why doesn't this jury get the choice? Well, in those cases, since that wasn't an issue put before the court, we don't know if the parties agreed on the instructions ahead of time and it wasn't even brought to the court's attention. For whatever reason, the reckless homicide was given. But we don't know if that's a determination the court made or if there was agreement between the parties. But who's the trier of fact in this case? Is it the judge or the jury? It's the jury. So who should make those decisions? The judge needs to make the legal determination if a rational jury can find him, can acquit him of a greater offense and only convict him on a lesser offense. That's a legal determination. But he's also supposed to follow the test. If there is some evidence, it's a question for the jury. It's a test. Because they get two instructions. It's essentially both tests need to be undertaken by the judge who has heard all the evidence at the time. And if the defendant is not entitled to get the lesser included offense instruction, it's the trial judge's duty. It's his obligation not to provide that incorrect instruction. So is your interpretation of McDonald that there are now two tests? Not only do you have to have some evidence, but then the court has to separately determine before the case is submitted to the jury whether a rational jury could convict defendant of the lesser included and acquit him of the greater offense. No, it's all one test. It's all one test. The court has not said that. So they said, I think, in McDonald, as long as there is some evidence to support a lesser included offense instruction, it should be given. Well, in McDonald, the court was determining some evidence versus some credible evidence and was the proper standard there. But the standard has always been whatever determination the determination is there. So we say some evidence. Some evidence. Some evidence that would permit a rational jury to acquit the defendant of a greater offense and determine that the defendant was guilty of the lesser offense only. It's all one determination. And the standard is some evidence. But for the lesser included to be proper, it still has to be something where the jury can acquit of the greater and only find the defendant guilty of the lesser offense. And on these factors, the defendant, as a trial court found, which was a proper determination and not abuse of his discretion, under these factors, any person who was driving in the city of Chicago of speed, twice the speed limit, in residential areas where there's people on the street, causing his front seat passenger that kind of fear, going through stop signs, accelerating his engine, the witness has heard him accelerate his engine as he neared the intersection and did not attempt to brake at all. That person had to know that their conduct would threaten great bodily harm or death to another. And so when Mr. Eubanks, in his interview, says, I drank a quart of Hennessy, which is a typical condition that leads a court to give the reckless homicide, it's not enough. The defendant made that statement, but he admitted, as the defendant argued in her brief, that he drank that much earlier in the day. And if you look at the time that we have the alcohol test from his blood, it is negative for alcohol. So whether he said he drank it at some point in time or not, those are some evidence to acquit of the first-degree murder. And if you look at the defendant's actions after the collision, first, when he strikes Maria Worthen and her son Jeremiah, he strikes her in the condition that he's driving with such force that her body pulls 30 feet into the air above the treetops, her head split open, and portions of her brain matter fell at the crime scene with her body traveling 100 feet away from where she was struck, breaking every bone in her skull as well as her pelvis, her right arm, and both legs. And the autopsy described it as a crushing injury. Those were the conditions that the defendant was knowingly driving at the time he struck and killed the victim in this case. And if you look at his actions after the collision, those show that he was consciously aware that his conduct threatened death or grave bodily harm. When Calvin told him, I hope you didn't hit what I thought you hit, his response was, it's too late. That's all he stated. He didn't panic. He didn't say, oh my goodness, what did I do, which might be what somebody would do if they were acting recklessly. He consciously knew that the way he was driving was going to result in death or grave bodily harm to somebody. And when it did, he didn't care. He had no concerns whether his victim lived or died in this case. He didn't stop to administer aid. He didn't report the accident as required under statute. Instead, he fled and required four different cars of a total of six officers to detain him. Those are actions of someone who is consciously aware that their actions were likely to cause death or grave bodily harm. Those are not actions of somebody who is acting in a reckless manner. He consciously intended his conduct, and death or grave bodily harm resulted. And in this case, if there was, if this court finds there was some evidence and a reckless homicide instruction should have been given, again, the defendant suffered no prejudice because the evidence was overwhelming on the first degree murder charge. And because the evidence was overwhelming, it was not, there was no prejudice suffered to the defendant, and the error would be harmless. Since the evidence is overwhelming, why not let the jury decide? Because the defendant was not legally entitled to the instruction in this case. And basically, and there was no harm to him in not receiving it for that reason. Very good. Why don't you proceed to the next argument? Turning to the second argument concerning the defendant's blood and urine draws. In this case, the trial court properly denied the defendant's motion to suppress the results of his blood and urine test. As it did below, the defendant makes two separate challenges in this regard. First, the defendant is arguing that Section 11-502C2 of the Motor Vehicle Code is constitutional facially and as applied to him. And second, he's arguing that the blood and urine samples taken from him were in violation of the Fourth Amendment. I'd like to address each of those separately. Turning first to the constitutionality of the statute, the defendant makes two challenges, the both facial and an as applied challenge. Both of those challenges have no validity. Turning to the facial challenge, as this court notes, the Illinois Supreme Court has held that the facial challenge is the most difficult challenge to mount, and a facial challenge must fail if there is any situation that exists where the statute could be validly applied. Now, our statute on his face allows an officer, if he has problem cause to believe that a motor vehicle has been driven by a person under the influence and has caused death or personal injury to another, that officer shall request a person to submit to a chemical test and that person shall submit. On his face, that's all that the statute states. The defendant is stating that within that statute is some sort of mandatory exception to the warrant requirement, and that's simply just not in the statute. The officer, if there's an implied consent statute only, and if the defendant does not consent under the statute, the officer has three choices. He can attempt to attain a warrant, he can proceed under the exigent circumstances, if they're applicable in that case, or he can simply allow the civil and evidentiary penalties of the defendant's refusal to consent to apply. Now, turning back to the statute itself. But then forcing the collection of blood and urine is not one of those options. The statute doesn't speak to that. The statute actually doesn't speak to the manner in which the blood and urine will be drawn. But Jones did. Jones remarked in that language that that's not the intention of the statute. And turning to the comments made by Jones in that regard, you have to look at the two samples differently. There's a blood draw and there's a urine sample, and both of them are taken under separate circumstances. So if you look at the urine sample, that sample was not taken with any type of physical force. The defendant voluntarily gave his urine. You see me looking out the window there as she's approaching him with the catheter. She has to actually start inserting it before he says, okay, okay, okay. That actually was not... That's an embellishment by the defense. But there's no evidence that the nurse is approaching him with the catheter. They did order a catheter. They did tell him. They did threaten him with catheterization. However, he did give that urine sample on his own. So if you want to say that that consent was involuntary or maybe forced, that may be an interpretation of that consent. However, Jones allows involuntary consent, and so does the exigent circumstances exception to the Fourth Amendment. Where are the exigent circumstances here? In this case, the exigent circumstances are so much greater... are great. And they're so much greater than even the court found in Schmerber v. California, which allowed a warrantless blood draw under exigent circumstances there. In Schmerber, as you recall, the officer was faced with an accident where there was a defendant that was injured and his front-seat passenger. He had to investigate that accident scene and transport the injured defendant driver to the hospital at the time that he took the blood. And that time, two hours passed, and the Supreme Court held that under those circumstances, the officer would be well within his belief that any further delay to get a warrant could result in destruction of evidence. And they found that the exigency there allowed the search. In our case, we have even greater exigencies than we did in Schmerber in that we had devastating injuries to our two victims. Maria Worthen was pronounced dead in the scene. What do the injuries to the victims have to do with whether the police here could have obtained a warrant in the seven hours between the time Mr. Eubanks was arrested and the time the blood and urine was collected? The injuries to the victims go to the magnitude of the crime and the magnitude of the investigative scene. So in this case, we have not one but two crime scenes because the defendant, unlike the defendant in Schmerber, was not there at the scene. The defendant did not choose to stay. Instead, he fled and then it all caused another high-speed chase where when the officers finally were able to detain him, he ping-ponged off of a series of parked cars creating a whole other crime scene. I got that. I got that. So now we have two crime scenes. He was arrested at 9 o'clock and the blood isn't drawn until seven hours later? Well, we don't even know. At 9 o'clock, when he's arrested, we don't even know that he, that they didn't even have probable cause to know that he was the driver of the crime at that point. Whose burden is it to show an exigency exception? Well, it's the defendant's burden to prevail and the motion to suppress. Whose burden is it to show the exception to the warrant requirement? Well, it would be the people's burden to show the warrant, the exigencies. But here we have more than what is sufficient and more than what the court allowed in Schmerber because the gravity of the crime, as Your Honor is saying, it's an investigative approach. We have to have probable cause to believe that the defendant was a person who's driving this vehicle and struck and killed this woman and it was under the influence. But the witnesses at the scene, and while the defense makes much of the fact that these witnesses could be interviewed right away, they didn't see the driver. They could tell the officers what happened, but that doesn't connect them to the driver. Schmerber and Jeter were there. But they didn't arrive at the scene. They were there for 10 minutes. No, no. It was a passenger. He was driving. But Calvin Jeter's testimony is that he did not arrive until 10 or 10.30. So in that time, he waited for Dennis Jeter to meet him at the bus stop, I believe. And then they got back and he testified it was 10. The officer said he didn't speak to him until 10.30. And if you look at his testimony, when he says what he told the officer, all of that time he told them was that Vogel was driving. They're going to ask him, what did you say? Why didn't you give him my real name? He said, I know he was Vogel. So at 10.30, an hour and a half after the accident, all we know is that Vogel was driving and that he had been drinking. Now we have a defendant arrested after a high-speed car chase in another area in a car which the officers can put together with this crash, but we don't know if he was the driver at the time of the collision because, as you know, they pulled over and Calvin Tanner got out of the car. So all of this investigative work has to go on, which required forensic investigators, a team of detectives. There's an officer who says, after he spoke to Mr. Eubanks, I was standing by waiting for instructions      waiting for instructions for a couple of hours, I think. I was standing by. Couldn't pick up the phone. Couldn't get a judge on the phone. I was standing by waiting for instructions Couldn't pick up the phone. Couldn't get a warrant. Couldn't do anything. Well, at those times, all of this investigative work is going on while that officer's job was to stay with the defendant. So he's waiting for the investigative officers, the forensic investigators who are on both scenes processing the evidence, the detectives who are talking to the witnesses. He is doing all of those things. And did all of that come in on the suppression hearing? It was done by stipulation.  but this court, the law says this court can consider all of the evidence from both the trial and the suppression hearing and determine whether or not there was a violation in determining a defendant's motion to suppress. So in this case, this court can consider all of the evidence that came forth at trial which shows the numerous accident circumstances. And because they had to put together whether the defendant was the driver and what exactly had happened in this devastatingly serious accident, collision, by the time they actually gave the defendant the warnings to motorists, it was 12-05. So they didn't know that they weren't going to get consent from the defendant until midnight, until three hours past in the accident. So at this point, the officers have to determine whether attempting to get a warrant and, as the court's point, it's 12-05 in the morning and December 21st, it's extremely unlikely that a judge would be available at that time to obtain a warrant. So you're saying you couldn't find any one of the 400 judges    There's like felony review, it's open 24-7, nobody could find anybody. There's so many judges in Cook County that they can't find anybody and there's no evidence that they tried to find someone. There isn't a judge that's on call in those hours. So there would have to be,  there's no evidence that the officers are able to find a judge. They have to be on call 24-7, right? That's correct. They know how to find judges, right? Well, they don't have a judge that works with felony review. That's what they're there for. They know how to find judges, right? They're state's attorneys. Well, they're actually working with, they're providing an investigative function at that time, so they're working with the police department. There's no judge that they can work directly with in the felony review department. You're asking us to believe that no desk sergeant, no commanding officer, no watch commander knows how to find a judge between 12 and 4 in the morning? There is certainly no evidence that there was a judge available during those times. But you're asking us to believe that it's okay that they didn't even try to find a judge. It's not like there's evidence that they tried to find some judge and they quit. There's just no evidence that they even tried. Is that a correct statement? There's no evidence regarding any attempts to find a judge. That's correct. However, under Schmerber, the court said that the determination that the police make, do the circumstances warrant a warrantless, do the circumstances necessitate a warrantless blood draw such that the officers could reasonably believe that attempting to get a warrant would further delay and cause the destruction of evidence. What was the delay? If he says, I'm not taking a test at 1210, what delay is there to pick up the phone and start calling to find a judge? At 1211, why wasn't somebody trying to find a judge? Now, if you couldn't find a judge until 410, okay, maybe that's an exigent circumstance. But not even trying, I don't see how that happens. I mean, I know that State Attorney's Office has been in business for a really long time. I know their job. I know that they know their job. I know that judges know their job. And believe me, if you had ever identified that there was not a judge on call every night to do warrants, and it brought that to the attention of the chief judge, I'm positive that somebody could have fixed it, or not. But between 1210 and 4, without even an attempt to find a judge, how is that exigent? How is that excuses? The blood draws suffocate at 4, but that is not the time that they were working on, that they were completing this process. So at 1205 is when they really, the defendants wanted to take the test at that point. That's correct. So at 1211, why aren't they hunting for a judge? Because this is a team investigation. But there should be cops involved in this thing. But the evidence that would be necessary to procure a search warrant would be that officer who was with the defendant, is unaware if he had a probable cause to draft a search warrant. This is a team of officers in a very complicated investigation. So the evidence that is needed to get probable cause had to come from a centralized detective who was in charge of the investigation who was advising the officer on what to do.          in charge of the investigation. And that was a team of officers who were in charge of the